**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PAR STERILE PRODUCTS, LLC,<br>6 Ram Ridge Road<br>Chestnut Ridge, NY 10977; and<br><br>ENDO PAR INNOVATION COMPANY,<br>LLC<br>6 Ram Ridge Road<br>Chestnut Ridge, NY 10977,<br><br>           Plaintiffs,<br><br>    v.<br><br>ERIC HARGAN, Acting Secretary of Health<br>and Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201;<br><br>U.S. DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES;<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201;<br><br>SCOTT GOTTLIEB, Commissioner of Food<br>and Drugs<br>10903 New Hampshire Avenue<br>Silver Spring, MD 20903; and<br><br>U.S. FOOD AND DRUG<br>ADMINISTRATION,<br>10903 New Hampshire Avenue<br>Silver Spring, MD 20903,<br><br>           Defendants. | Case No._____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Par Sterile Products, LLC and Endo Par Innovation Company, LLC (collectively, "Par") bring this suit against Defendants Eric Hargan, in his official capacity as Acting Secretary of Health and Human Services; the U.S. Department of Health and Human Services (DHHS); Scott Gottlieb, in his official capacity as Commissioner of Food and Drugs; and the U.S. Food and Drug Administration (FDA), and state as follows:

## PRELIMINARY STATEMENT

1. This suit challenges FDA's decision to treat Congress's statutory regime for "bulk drug compounding" like a non-binding recommendation rather than the specific statutory mandate it is. In 2012, a compounded drug illegally manufactured in bulk by the New England Compounding Center was contaminated with fungus and caused a meningitis outbreak claiming dozens of lives and sickening hundreds of others. 159 Cong. Rec. H5964 (daily ed. Sept. 28, 2013) (statement of Rep. Timothy F. Murphy). The "outbreak [wa]s one of the worst public health disasters in our country's history." *Id.* In response, Congress prescribed specific statutory procedures that FDA must follow before authorizing bulk compounding. FDA has ignored that Congressional mandate for four years and has instead chosen to implement its own "interim" bulk compounding program directly contrary to specific requirements of the statute. Pursuant to that unlawful program, FDA has improperly authorized bulk compounding of hundreds of drugs, including a drug product that is "essentially a copy" of Par's FDA-approved drug. FDA's actions violate the Federal Food, Drug, and Cosmetic Act (FDCA) and the Administrative Procedure Act (APA) and threaten immediate irreparable harm to Plaintiffs.

2. The FDCA, passed in 1938, generally requires that any new drug introduced into interstate commerce first be approved by FDA according to specific statutory criteria and procedures. *See* 21 U.S.C. § 355(a). This pre-approval process is intended to ensure the safety

and efficacy of drugs marketed to the American public, and it involves painstaking efforts on behalf of the applicant and FDA.  In 1984, Congress amended the FDCA through the Drug Price Competition and Patent Term Restoration Act (the Hatch-Waxman amendments) to create streamlined statutory approval pathways for certain follow-on drug products, notably generic equivalents that contain the same active ingredient as a previously approved drug, but again conditioned use of those pathways on compliance with statutory criteria and procedures that assured the American public of the safety and efficacy of those drug products.  Pub. L. No. 98-417, 98 Stat. 1585 (1984).  In enacting the carefully crafted Hatch-Waxman amendments, "Congress struck a balance between two competing policy interests: (1) inducing pioneering research and development of new drugs and (2) enabling competitors to bring low-cost, generic copies of those drugs to market."  *Andrx Pharm., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1371 (Fed. Cir. 2002).

3.      Traditionally, the act of "compounding" a medication was a patient-specific process, a constituent part of the state-regulated practice of pharmacy distinct from the FDA-regulated manufacturing of drugs for widespread marketing and distribution.  Compounders were typically individual pharmacists who mixed or prepared a specific medication for an individual patient at a physician's request and pursuant to a prescription documenting the need for the alteration, mixture, or preparation.  For example, a pharmacist might "compound" an ordinarily solid oral dosage form of a drug into an oral liquid dosage form for an elderly patient who could not swallow pills.

4.      By the early 1990s, however, the distinction between traditional pharmacy compounding and large-scale drug manufacturing began to blur.  Concerns emerged that compounding operations unregulated by FDA "were purchasing bulk quantities of drug products,

'compounding' them into specific drug products *before* receiving individual prescriptions, and marketing those drugs to doctors and patients"—essentially, "manufacturing drugs" without FDA approval and the necessary safety and efficacy protections the FDCA imposes. *Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 389 (5th Cir. 2008) (emphasis added). For nearly two decades FDA, prompted by Congress, took various steps to loosely oversee these operations. But in 2013, as a result of the public health crisis and deaths triggered by compounding, Congress enacted the Drug Quality and Security Act (DQSA) to, among other things, add a new section, 503B, to the FDCA that imposed specific statutory obligations on FDA to assure effective regulation of bulk compounding operations.

5.      The DQSA made clear that bulk compounded drugs are generally subject to the provisions of the FDCA applicable to traditionally manufactured drugs, including FDA's rigorous new-drug approval process. *See* Dear Colleague Letter from Margaret A. Hamburg, M.D., Commissioner of Food and Drugs at 2 (Jan. 8, 2014) ("If a compounded drug does not qualify for an exemption under [the DQSA], it would be subject to all of the requirements of the [FDCA] . . . including the new drug approval . . . requirements.") [hereinafter Dear Colleague Letter]. The DQSA authorized FDA—under certain specific and narrow circumstances—to exempt bulk compounding of particular drugs from the new-drug approval process. First, FDA cannot authorize bulk compounders to produce a drug simply to compete with or replace an FDA-approved drug. *See* 21 U.S.C. § 353b(a)(5) (prohibiting compounding a drug that is "essentially a copy of one or more approved drugs"). Second, section 503B(a)(2)(A)(i) mandated that FDA make a record-based determination that bulk compounding using a particular drug substance is necessary to satisfy a "clinical need" unmet by the use of approved drug products. *See id.* § 353b(a)(2)(A)(i). Third, the DQSA provides that FDA can make such a

determination **only after** publishing a proposal in the Federal Register that includes "the rationale for such proposal" and providing "a period of not less than 60 calendar days for comment." *Id*. § 353b(a)(2)(A)(i)(I)-(II).  Finally, the DQSA requires that FDA publish a notice of its ultimate decision in the Federal Register.  *See id.* § 353b(a)(2)(A)(i)(III).  Only then, after the conclusion of that statutory process where each element is fully satisfied, can FDA authorize bulk compounding by adding the specific drug substance to its Clinical Need List.  *See id.* § 353b(a)(2).

6.     A principal purpose of the DQSA was to prevent unapproved bulk compounded drugs from circumventing FDA's drug approval process (and thereby undermining the FDCA) when there is no demonstrated, genuine clinical need for a compounded version of a drug. *Id.* § 353b(a)(2), (5).  FDA has itself repeatedly recognized this fundamental fact.  *See, e.g.*, Dear Colleague Letter at 2 ("Because they do not go through the drug approval process, compounded drugs . . . should only be used when an FDA-approved product is not available to meet the medical needs of an individual patient.").  And the DQSA was not designed to alter the Hatch-Waxman pathways for follow-on drug products, as confirmed by its express prohibition on bulk compounding of a drug that is "identical or nearly identical to an approved drug" unless there is a drug shortage.  21 U.S.C. § 353b(a)(5), (d)(2)(A).

7.     Although four years have passed since Congress enacted the DQSA, FDA has shockingly chosen to ignore key components of that Act and has not implemented a Clinical Need List.  Instead, FDA has established a different system that blindly authorizes bulk compounding without the statutorily-mandated scrutiny.  *See* FDA, *Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act* (Jan. 2017),

https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/
UCM469122.pdf [hereinafter Bulk Compounding Decree].

8.     For example, rather than following the prescribed notice-and-comment procedures in Section 503B(a)(2)(A)(i) before placing bulk drug substances on a Clinical Need List, FDA's Bulk Compounding Decree uses a "nomination" process that is not subject to notice and comment.  And instead of approving bulk compounding for which FDA has found, based on record evidence, that there *is* an actual clinical need, FDA's framework approves a nomination based on a determination that the nominations submitted by compounders are sufficiently complete to enable FDA's substantive review *at some later, unspecified date*.  Further, FDA has ignored the express statutory prohibition against compounding *copies* of FDA-approved drugs and the provisions added to the FDCA by the Hatch-Waxman amendments that explicitly set forth the statutory criteria and procedures applicable to follow-on drug products, and has instead authorized compounding of these very drugs.  FDA has chosen to avoid rigor in examining what does and does not constitute a copy, leaving it to self-serving representations (and misrepresentations) of compounders in their nominations.  Under its regime, FDA has authorized the mass compounding of dozens of drugs without subjecting them to the premarket review and approval framework *or* concluding that they qualify for the exception mandated by Section 503B(a)(2)(A)(i).  This extra-statutory regime may be easier for FDA to administer, but it does not conform to the statute.

9.     Par is the manufacturer of FDA-approved Vasostrict®, a lifesaving injection that raises arterial blood pressure in certain patients to ensure adequate blood delivery to those patients' vital organs.  Because it is administered intravenously to patients in emergency rooms, intensive care units, and other sensitive hospital settings, Vasostrict® must be manufactured and

maintained in sterile conditions.  The active ingredient in Vasostrict® is vasopressin.  As required by section 505(a) of the FDCA, 21 U.S.C. § 355(a), Par submitted a new drug application (NDA) for Vasostrict® in September 2012.  FDA approved Vasostrict® as a treatment for septic shock and post-cardiotomy shock in April 2014.  According to FDA, approval of the NDA was "critical to ensuring the safety and efficacy" of vasopressin.  Mary Ross Southworth & Anna M. Fine, *FDA Information on Vasostrict Storage*, FDA News for Health Professionals (May 2015), https://www.fda.gov/downloads/forhealthprofessionals/articlesofinterest/ucm446992.pdf. Compounded products, in contrast, lack any of the assurances of safety and efficacy that are part of FDA's review of an NDA.

10.     Vasostrict® remains the only FDA-approved drug product containing vasopressin.  There is no unmet clinical need for any bulk compounded product utilizing vasopressin, and FDA has not made and cannot make a determination that any such clinical need exists.  To the best of Par's knowledge, there is no evidence that any patient subpopulation needs any reformulated version of vasopressin, or any vasopressin dosage level that Vasostrict® does not already provide.  Further, to the best of Par's knowledge, no one has sought FDA approval to market a follow-on version of Vasostrict® under the Hatch-Waxman amendments.

11.     Pursuant to its Bulk Compounding Decree, on or about July 1, 2017, FDA authorized the large-scale production of unapproved vasopressin that will be administered to patients in a form that is essentially a copy of Vasostrict®.  FDA did so without complying with Section 503B.  FDA issued no notice seeking comment before making that determination, and instead based its decision on a one-and-a-half page "nomination"—consisting of a fill-in-the-blank Excel spreadsheet—submitted by a compounder that did not identify any potential unmet

"clinical need" for the product. These actions are inconsistent with both FDCA Section 505, which requires new drugs to go through one of the statutory new-drug approval pathways unless an exemption applies, and Section 503B, which requires the agency to follow all of the precise procedures set forth above in paragraph 5 (including notice and comment) to grant such an exemption for bulk compounding. *See* 21 U.S.C. §§ 353b, 355. Indeed, FDA does not even *claim* to have made the requisite record-based determination that vasopressin is appropriate for bulk compounding because it satisfies a clinical need. *See* Bulk Compounding Decree at 8 (admitting that this is an issue that will not be evaluated until a later date).

12. And because certain uses of vasopressin are covered by Par's five unexpired patents listed in FDA's Orange Book, *see* U.S. Patent Nos. 9,375,478; 9,687,526; 9,744,209; 9,744,239; 9,750,785, anyone seeking FDA's approval to market such a follow-on version of Vasostrict® must comply with the patent-protection provisions of the FDCA applicable to follow-on drug products introduced by the Hatch-Waxman amendments. For example, under those amendments, a follow-on drug applicant must provide a certification regarding the patents listed in the Orange Book and provide notice to Par, 21 U.S.C. § 355(b)(2)(A), (b)(3)(C), (j)(2)(A), (j)(2)(B)(iii), Par is entitled to confidential access to the follow-on drug application, *id.* § 355(c)(3)(D)(i)(I)(cc), (j)(5)(C)(i)(I)(cc), and, most importantly, approval of the drug application would be automatically stayed for up to 30 months in the event Par initiates patent litigation, *id.* § 355(c)(3)(C), (j)(5)(B)(iii). The Bulk Compounding Decree authorizes what are in effect follow-on drug products without any of these statutory protections.

13. Beginning on July 1, 2017 and continuing up through October 26, 2017, Par has tried exhaustively—through multiple submissions, teleconferences, and in-person meetings—to convince FDA to reverse its misguided actions by withdrawing its authorization to compound

vasopressin and replacing its unlawful regime with a regulatory structure actually consistent with the FDCA.  For instance, Par wrote to FDA on July 11, 2017, on July 24, 2017, and on September 11, 2017, each time requesting that FDA not authorize—or immediately withdraw its authorization of—bulk compounding of vasopressin.  Par reiterated those requests at an in-person meeting with FDA officials at FDA's headquarters on September 11, 2017.  In addition, Par and its counsel have had numerous discussions with FDA officials via phone and email, including a teleconference on October 20, 2017, attempting to resolve this dispute.  Despite all this, FDA has repeatedly declined to take any action, even though Defendant FDA Commissioner Gottlieb subsequently conceded in a public interview that the agency's current framework for regulating compounding is flawed and should be changed.

14.    In the meantime, one compounder has made unequivocal statements in a separate federal judicial proceeding that it is working to launch a vasopressin bulk compounded drug "as soon as possible," and at least one other compounder appears to have a similar intent.

15.    Judicial relief is therefore warranted for the following reasons:

•    FDA's Bulk Compounding Decree is contrary to law: it authorizes bulk compounding of new drugs where the applicable statutory requirements are not satisfied and is fundamentally inconsistent with the plain language and structure of the FDCA statutory regime for introducing new drugs (including the FDCA's patent-protection provisions for follow-on drugs).

•    FDA's specific authorization allowing bulk compounding of vasopressin is contrary to the FDCA for the same reasons: FDA has not (and cannot) determine that bulk compounding of vasopressin is necessary to meet any "clinical need" or that it satisfies the other mandatory criteria of the DQSA, and unapproved vasopressin drugs

have not gone through any FDCA statutory approval pathway and do not qualify for any exemption from those pathways.

16.     Par therefore prays that the court (i) declare unlawful and set aside FDA's Bulk Compounding Decree; (ii) declare unlawful and set aside FDA's actions with respect to vasopressin; and (iii) grant preliminary and permanent injunctive relief prohibiting FDA from authorizing the compounding of vasopressin and other drugs except in proper compliance with the FDCA.

## PARTIES

17.     Plaintiff Par Sterile Products, LLC is the owner of New Drug Application No. 204485 for Vasostrict®.  Par Sterile Products, LLC is a Delaware limited liability company with its principal place of business at 6 Ram Ridge Road, Chestnut Ridge, NY 10977.  Par Sterile Products, LLC advertises, sells, and distributes its drugs in this District and nationwide.

18.     Plaintiff Endo Par Innovation Company, LLC is the beneficial owner of certain intellectual property rights associated with Vasostrict®.  Endo Par Innovation Company, LLC is a Delaware limited liability company with its principal place of business at 6 Ram Ridge Road, Chestnut Ridge, NY 10977.

19.     Eric Hargan is the Acting Secretary of Health and Human Services and the head of DHHS.  In this capacity, Acting Secretary Hargan has ultimate responsibility for activities at DHHS, including the actions complained of herein.  His governmental activities occur in this District and nationwide.

20.     DHHS is a department of the United States.  Its headquarters and principal place of business are at 200 Independence Avenue, S.W., Washington, D.C. 20201.  Its governmental activities occur in this District and nationwide.

21.     Scott Gottlieb is the Commissioner of Food and Drugs and the head of FDA.  His governmental activities occur in this District and nationwide.

22.     FDA is an agency of the United States and a division of DHHS.  FDA's headquarters and principal place of business are at 10903 New Hampshire Avenue, Silver Spring, MD 20903.  Its governmental activities occur in this District and nationwide.

## JURISDICTION, EXHAUSTION, AND VENUE

23.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  This action arises under the APA, 5 U.S.C. §§ 701-06.  Plaintiffs' prayers for a declaratory judgment and preliminary and permanent injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the APA, 5 U.S.C. §§ 701-06; and 28 U.S.C. § 1361.

24.     Immediate judicial review is warranted because Plaintiffs have made exhaustive efforts to obtain relief from FDA and those efforts have been unsuccessful, Plaintiffs face significant and irreparable harm from FDA's action, and Plaintiffs have no other adequate remedy.

25.     Venue is proper in this District under 28 U.S.C. § 1391(e) because at least one Defendant is an officer or agency of the United States and resides in this District.

## BACKGROUND

### A.     Statutory Framework For New Drug Approvals

26.     The FDCA regulates drug manufacturing, marketing, and distribution in interstate commerce.  The Act's core proscription is on the introduction of any "new drug" into interstate commerce absent premarket approval by FDA.  21 U.S.C. § 355(a).  The term "new drug" includes "*any* drug" that is "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling

thereof." *Id.* § 321(p) (emphasis added). The exemption from this definition for drugs that are "generally recognized . . . as safe and effective," *id.*, is very narrow and is inapplicable here. *See, e.g.*, 21 C.F.R. § 314.200(e)(1).

27. The principal pathway for the requisite premarket approval is through a full New Drug Application (NDA) submitted pursuant to section 505(b)(1) of the FDCA. Such an NDA must contain complete reports of investigations of the safety and effectiveness of the product candidate gathered through expensive clinical trials. 21 U.S.C. § 355(b)(1). This pathway is typically used for truly new drugs.

28. The Hatch-Waxman amendments to the FDCA added multiple streamlined statutory pathways for follow-on drug products like "generic" drugs or drugs that differ from already approved drugs in certain specified ways (*e.g.*, dosage form, formulation, or route of administration). *See generally id.* § 355(j)(2)(A), (j)(2)(C), (j)(4), (b)(2). All of these streamlined pathways involve submission of extensive scientific information to FDA and require FDA's approval prior to marketing of the follow-on drug product.

29. When enacting the Hatch-Waxman amendments, Congress recognized that it must balance the interest of supporting more expeditious drug approvals for follow-on drugs with the interests of original drug sponsors who engage in more extensive research and development. Indeed, imitator drugs can quickly flood the market and devastate a previously approved drug's economic viability. Accordingly, the Hatch-Waxman amendments also instituted a framework that prohibits FDA from approving drugs where certain patent disputes may arise. If an unexpired patent exists potentially covering the drug product at issue, the applicant for the follow-on drug product must certify that it will not seek approval prior to the expiration of that patent (if it is listed in the so-called Orange Book and is otherwise unexpired)

or that the patent is either invalid or will not be infringed by the proposed follow-on drug. *See id.* § 355(b)(2)(A)(i-iv), (j)(2)(A)(vii)(I-IV). In the case of a certification that the subject patent is either invalid or not infringed, the applicant must provide notice to each relevant patent owner to explain its invalidity or non-infringement rationale. And if the patent owner initiates patent litigation within 45 days of receiving such notice, FDA must stay approval of the application for up to 30 months in order to allow that litigation to proceed. *See id.* § 355(c)(3)(C), (j)(5)(B)(iii).

30.     Because Congress has enacted a carefully calibrated statutory regime setting forth the appropriate pathways for new drug and follow-on drug approvals, FDA may not add its own non-statutory pathways to approve drugs. *See, e.g., Cutler v. Kennedy*, 475 F. Supp. 838, 854 (D.D.C. 1979) ("The Commissioner's . . . regulations formally authorize the continued marketing of . . . drug products in the absence of an administrative determination that those products are, today, generally recognized by experts as safe and effective. This flies in the face of the statutory scheme."); *Hoffmann-LaRoche, Inc. v. Weinberger*, 425 F. Supp. 890, 894 (D.D.C. 1975) ("FDA's policy of permitting new drugs to be marketed without an approved new drug application contravenes the clear statutory requirement of preclearance mandated by 21 U.S.C. § 355 (1970)."); H.R. Rep. No. 98-1168, at 21 (1984) ("FDA has no legal authority to permit the marketing of any unapproved 'new drug.'").

### B.     History Of FDA's Regulation Of Drug Compounding And Congress's Intervention

31.     Traditionally, compounding refers to the process by which a pharmacist combines or alters drug ingredients pursuant to a physician's prescription to create a medication that meets the unique needs of an individual patient. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 360-61 (2002); *see also United States v. Franck's Lab, Inc.*, 816 F. Supp. 2d 1209, 1216 (M.D. Fla. 2011) ("The pharmacist-prescriber-patient relationship forms the basis of what is

commonly known as 'traditional pharmacy compounding.'"), *order vacated*, *appeal dismissed*, No. 11-15350, 2012 WL 10234948 (11th Cir. Oct. 18, 2012) (per curiam).  An individual patient may, for example, be "allergic to an ingredient in a mass-produced product," and his physician may accordingly prescribe a compounded drug that does not contain the offending ingredient, which the pharmacist may then provide.  *Thompson*, 535 U.S. at 360.

32.     In the early 1990s, however, concerns emerged that certain pharmacists were creating large-scale "outsourcing operations" by "purchasing bulk quantities of drug products, 'compounding' them into specific drug products before receiving individual prescriptions, and marketing those drugs to doctors and patients."  *Med. Ctr. Pharmacy*, 536 F.3d at 389.  In other words, those pharmacists were "manufacturing drugs under the guise of compounding them."  *Id.* And profound health issues were emerging as well.  For example, some compounders altered approved drugs such that their application caused people literally to lose their eyes.  *See* Associated Press, *Eye Drop Injuries Prompt an F.D.A. Warning*, N.Y. Times, Dec. 9, 1990, http://www.nytimes.com/1990/12/09/us/eye-drop-injuries-prompt-an-fda-warning.html.     FDA responded by announcing broad regulatory authority over compounding and threatening enforcement actions based on an *ad hoc* list of nine factors FDA would consider when evaluating a given pharmacy.  *See* FDA, *Compliance Policy Guide No. 7132.16, Manufacture, Distribution, and Promotion of Adulterated, Misbranded, or Unapproved New Drugs for Human Use by State-Licensed Pharmacies* (Mar. 16, 1992).

33.     In 1997, Congress determined that a statutory solution was needed and replaced FDA's policy by enacting the Food and Drug Administration Modernization Act (FDAMA). The FDAMA comprehensively amended the FDCA with regard to many issues, but as relevant here, it made plain that "compounded drugs *are* 'new drugs'" under the statute.  *Med. Ctr.*

*Pharmacy*, 536 F.3d at 394 (emphasis added). And it added a statutory framework—at Section 503A—for determining whether a compounded drug is exempt from FDA's drug approval process. *Id.* To qualify for that exemption, a drug must be "compounded by a licensed pharmacist or physician in response to a valid prescription for an identified individual patient, or, if prepared before the receipt of such prescription, . . . made only in 'limited quantities' and in response to a history of the licensed pharmacist's or physician's receipt of valid prescription orders for that drug product within an established relationship between the pharmacist, the patient, and the prescriber." *Thompson*, 535 U.S. at 364.

34. After the Supreme Court invalidated advertising-related provisions of the FDAMA on First Amendment grounds in 2002, FDA took the position that the other provisions of the statute were not severable—a conclusion some courts ultimately rejected. In accordance with that view, FDA issued a new policy, materially identical to the one it employed *before* the FDAMA, that reserved to the agency the authority to determine pursuant to *ad hoc* standards whether or not to enforce the FDCA against drug compounders. *See* FDA, *Compliance Policy Guide No. 460.200, Pharmacy Compounding* (May 29, 2002) [hereinafter CPG 460.200]. This policy "strongly suggested" FDA would not enforce the statute against bulk compounders that compounded with bulk drug substances that were components of FDA-approved drugs. Anna B. Laakmann, *Customized Medicine and the Limits of Federal Regulatory Power*, 19 Vand. J. Ent. & Tech. L. 285, 305 (2016); *see also* CPG 460.200 at 4 (considering for enforcement "[c]ompound[ed] finished drugs from bulk active ingredients that are *not* components of FDA approved drugs" (emphasis added)).

35. As a result of the loophole in FDA's new policy, the mass compounding industry quickly reemerged, with "outsourcing facilities" manufacturing large quantities of drugs for

wholesale distribution under the guise of compounding.  *See* 159 Cong. Rec. H5963 (daily ed. Sept. 28, 2013) (statement of Rep. Diana DeGette); *id.* (statement of Rep. Gene Green) ("Large operators were able to sell products interstate in an unregulated gray area.").  In 2013, that issue came to a head after a tragedy in which the New England Compounding Center manufactured and shipped throughout the country a drug contaminated with infectious agents including black mold that led to an outbreak of fungal meningitis.  Several dozen people died, and many hundreds more were infected.

36.     Unlike a traditional compounder, the facility was "selling large shipments of drugs without prescriptions."  *See* Kurt Eichenwald, Killer Pharmacy: Inside a Medical Mass Murder Case, Newsweek, Apr. 16, 2015, http://www.newsweek.com/2015/04/24/inside-one-most-murderous-corporate-crimes-us-history-322665.html.  In other words, it was "conducting business like a manufacturer."  *Id.*  As FDA has admitted, this tragedy was not "an isolated event."  FDA, *Human Drug Compounding Progress Report* 5 (Jan. 2017), https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/PharmacyCompounding/UCM536549.pdf.  Instead, FDA noted that because it "does not verify the[] safety, effectiveness, or quality" of compounded drugs before they are marketed, these products have generated "a long history of serious adverse events associated with contaminated, super-potent, mislabeled, or otherwise poor quality."  *Id.* at 4-5.

37.     Following this incident, the mass compounding industry attracted intense media and legislative scrutiny.  Congress and the public quickly realized that what happened at the New England Compounding Center was very likely to happen again—numerous other unsafe facilities were already in operation throughout the country.  *See* 159 Cong. Rec. S8074 (daily ed. Nov. 18, 2013) (statement of Sen. Dianne Feinstein) ("You might think that a story like this is rare.  What

we have learned is that it is not.  The report by the [U.S. Senate Committee on Health, Education, Labor, and Pensions] found that in the 8 months immediately after the outbreak caused by [New England Compounding Center]–manufactured drugs, 48 other compounding companies were found to be producing drugs that were either unsafe or were made in unsafe environments.").

38.     Congress properly responded by enacting the DQSA, which imposed further restrictions on mass compounding.  The DQSA reenacted Section 503A without the advertising-related provisions the Supreme Court had held unconstitutional.  The DQSA also added a new section, 503B, which specifically targeted the "outsourcing facilities" comprising the mass compounding industry.   Similar to Section 503A, Section 503B makes plain that bulk compounding outside the new-drug approval process is barred unless certain requirements are met.  *See* 21 U.S.C. § 353b(a).  Under Section 503B, a mass compounder that registers as an "outsourcing facility" may, unlike a traditional compounder, distribute compounded drugs that are not patient specific without going through the new-drug approval process.  *See id.* § 353b(d)(4)(C).  And it may use bulk drug substances (*i.e.*, active ingredients, rather than finished drug products) to make those compounded drugs.  *See id.* § 353b(a)(2).  But it may do these things <u>only</u> if multiple statutory requirements are completely satisfied.

39.     First, the facility may use a bulk drug substance only if (1) the substance appears on the Clinical Need List or (2) the drug compounded from the substance appears on the Shortage List, a list of drugs that FDA has determined, pursuant to 21 U.S.C. § 356e, are in shortage in the United States.  *See id.* § 353b(a)(2)(A)(i), (ii).  The statute provides that, to add substances to the Clinical Need List, FDA must conduct notice-and-comment rulemaking by publishing a notice in the Federal Register proposing substances for the list, providing at least 60

days for comment, and then publishing a final notice designating the substances for inclusion. *Id.* § 353b(a)(2)(A)(i)(I)-(III).

40.     Second, the compounded drug must not constitute "essentially a copy of one or more approved drugs."   *Id.* § 353b(a)(5).   The term "essentially a copy" includes any compounded drug products that are either "identical or nearly identical to an approved drug." *Id.* § 353b(d)(2)(A).   It therefore includes both generic versions and other follow-on drug products that must be submitted to FDA for approval pursuant to the FDCA's streamlined pathways.

41.     Moreover, and critically, even if the compounded drug is neither identical nor nearly identical to an approved drug, it is still "essentially a copy" if it contains a "bulk drug substance that is a component of an approved drug . . . *unless* there is a change [in the drug] that produces for an *individual* patient a clinical difference, as determined by the prescribing practitioner, between the compounded drug and the comparable approved drug." *Id.* § 353b(d)(2)(B) (emphases added).   The statute therefore expressly does *not* permit a pre-modification of dosage form that is generalized, such as a pre-dilution of an already-approved product that is diluted in its current normal course of use.

42.     Even though the current version of Section 503B was enacted in 2013, FDA has inexplicably not published the Clinical Need List or engaged in the required notice and comment process necessary to create such a list.

## C.     FDA's Extra-statutory Regime For Bulk Drug Compounding

43.     Rather than implement the regime that Congress directed FDA to implement, the agency created its own extra-statutory framework for regulating bulk compounding.   In July 2014, FDA opened a docket to accept "nominations" for bulk drug substances for eventual inclusion on the Clinical Need List.   *See* Bulk Drug Substances That May Be Used To

Compound Drug Products in Accordance With Section 503B of the Federal Food, Drug, and Cosmetic Act; Revised Request for Nominations, 79 Fed. Reg. 37,750, 37,751 (July 2, 2014) [hereinafter Request for Nominations].  According to that process, a nomination has to, *inter alia*, (1) describe the medical condition that the drug compounded with the nominated bulk drug substance is intended to treat; (2) provide a list of FDA-approved products that treat the same condition; (3) address why, if an FDA-approved product is available, a compounded drug product is necessary and why the compounded drug product must be compounded from a bulk drug substance, rather than from the FDA-approved product itself; and (4) estimate the number of persons who would need the compounded drug product.  *See id.* at 37,751.  FDA's Request for Nominations does not require any substantiation whatsoever by a party submitting a nomination that the information provided is accurate or complete or that such party disclose unfavorable information.

44.     Although many substances have been *nominated* pursuant to this process, FDA has never actually taken the statutorily mandated notice and comment steps to officially add any substances to the Clinical Need List.  Instead, in October 2015, FDA proposed to establish an "Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act."  The extra-statutory regime this document established— as finalized in June 2016 and significantly amended in January 2017 in the Bulk Compounding Decree—allows bulk compounding using the nominated substances regardless of and wholly contradictory to the statutory requirements.

45.     Under its unlawful regime, FDA grouped the nominated substances into three categories:  Category 1 comprises substances "Currently Under Evaluation," which "may be eligible for inclusion on the [Clinical Need List], were nominated with sufficient supporting

information for FDA to evaluate them, and do not appear on any other list." Bulk Compounding Decree at 5. Category 2 comprises substances that were nominated with sufficient supporting information but for which "FDA has identified significant safety risks relating to the use of these substances in compounding pending further evaluation." *Id.* at 5–6. Category 3 comprises substances that were nominated without sufficient supporting information. *Id.* at 6.

46. Under FDA's unlawful regime, a substance may be included in Category 1 only if it may be eligible for inclusion on the Clinical Need List, it was nominated with sufficient supporting information for FDA to evaluate it, and FDA has not identified significant safety risks relating to the use of the substance in compounding. *See id.* at 5–6. FDA conducts *no* record-based review before placing substances in Category 1—by its plain terms, the Bulk Compounding Decree places substances in Category 1 if they have merely been nominated "with adequate supporting information for FDA to evaluate [them]," ostensibly at some indeterminate, hypothetical future date. *Id.*

47. FDA has admitted it makes absolutely no clinical need determination before placing a drug in Category 1—indeed, a framework for making such determination does not even exist. *See* Remarks of Anna Abram, FDA Deputy Commissioner for Policy, Planning, Legislation, and Analysis, *Remarks for the 50 State Intergovernmental Meeting to Discuss Pharmacy Compounding* (Sept. 26, 2017), www.fda.gov/NewsEvents/Speeches/ucm577484.htm ("FDA is actively working to . . . develop the criteria it will use to evaluate clinical need for compounding with bulk drug substances.").

48. The Bulk Compounding Decree states that FDA "does not intend to take action against an outsourcing facility for compounding a drug using a bulk drug substance that does not appear on the [Clinical Need List] and that is not used to compound a drug that appears on the

[Shortage List] at the time of compounding, distribution, and dispensing, provided that" the substance is in Category 1 and certain other conditions are satisfied.  Bulk Compounding Decree at 8.

49.     In other words, even though Section 503B authorizes bulk compounding only if the substance appears on the Clinical Need List or the drug compounded from the substance appears on the Shortage List, FDA allows bulk compounding if the substance is in Category 1 of its nominations list.  FDA has confirmed this interpretation of the Bulk Compounding Decree in a warning letter to an outsourcing facility, stating that a bulk drug substance was "not eligible for the policy described in the [Bulk Compounding Decree] because it was not nominated . . . .  In the future, you should only compound drug products using bulk drug substances that may be used in compounding under section 503B, or that are eligible for the interim regulatory policy described in [the Bulk Compounding Decree]."  Letter from Karlton Watson, Acting Dall. Dist. Dir., FDA, to Mary P. Moyer, President & Chief Sci. Officer, INCELL Corp. (Oct. 28, 2016), https://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2016/ucm533263.htm.

50.     Although FDA initially described the Bulk Compounding Decree as a temporary measure, it has since abandoned that pretense.  In July 2017, the Office of Management and Budget moved FDA's implementation of Section 503B to the "inactive list," indicating that the agency is no longer working on that effort.  *See* Office of Mgmt. & Budget, *2017 Inactive Actions* 5 (2017), https://www.reginfo.gov/public/jsp/eAgenda/ InactiveRINs_2017_Agenda_Update.pdf; *FDA To Cease Work On Certain Tobacco, Advertising, Food Safety Rules*, FDA Week, July 27, 2017, https://insidehealthpolicy.com/fda-week/fda-cease-work-certain-tobacco-advertising-food-safety-rules ("FDA is stopping work on . . . a regulation defining exemptions from compounding requirements for 503A and 503B

pharmacies."). Thus, FDA has indefinitely postponed the process mandated by Section 503B and has substituted the process established by the Bulk Compounding Decree in its place.

51.     FDA's decision to ignore Congress's clear command to subject bulk compounding to rigorous scrutiny is inviting a new public health crisis like that caused by New England Compounding Center. Indeed, just last week, a major bulk compounder announced a mass recall due to potential microbial contamination of almost a dozen bulk compounded drugs. *See* FDA, *SCA Pharmaceuticals Issues Voluntary Nationwide Recall of Specific Products Due to Potential Contamination* (Oct. 20, 2017), https://www.fda.gov/Safety/Recalls/ucm581531.htm.

### D.     Par's Vasostrict®, And The Nomination Of Vasopressin For Category 1

52.     On September 25, 2012, Par submitted an NDA under Section 505(b)(2) of the FDCA seeking marketing approval for Vasostrict® (vasopressin injection, USP), 20 units/mL packaged as 1 mL per vial. Over roughly the next eighteen months, Par submitted numerous amendments to this application until, on April 17, 2014, Par's NDA for Vasostrict® was approved by FDA for use to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines. Vasostrict® must be diluted in a saline or dextrose solution before use, and the FDA-approved labeling provides instructions for doing so. *See Vasostrict® Label* (Dec. 2016), https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/204485s004lbl.pdf. On December 21, 2016, Par obtained FDA approval to market a new 10 mL, multi-dose vial presentation of Vasostrict®, which makes it easier for hospitals to prepare dilutions in the form of premixed IV bags and syringes. Par continues to hold the NDA for Vasostrict® today and there are 5 unexpired patents associated with Vasostrict® listed in the Orange Book. Vasostrict® is currently the only FDA-approved vasopressin product on the market.

53.     Although critically important to certain patients, vasopressin products are associated with an array of potential adverse reactions including hemorrhagic shock, heart failure, and acute renal insufficiency; the improper storage, preparation, or administration of vasopressin products may also have significant adverse consequences.  *See id.*  Overdosage may result in vasoconstriction of various vascular beds (peripheral, mesenteric, and coronary), hyponatremia and/or ventricular tachyarrhythmias (including Torsade de Pointes), rhabdomyolysis, and non-specific gastrointestinal symptoms.  The labeling for Vasostrict® warns that aggressive treatment may compromise the perfusion of organs such as the gastrointestinal tract, whose function is difficult to monitor.  The Institute for Safe Medication Practices, a nonprofit organization focused on the safe use of medications and the prevention of medical errors, includes vasopressin (intravenous or intraosseous) on a list of "high alert medications in acute care settings" that are associated with a heightened risk of causing significant patient harm when used in error.  *See* Inst. for Safe Medication Practices, *ISMP List of High-Alert Medications in Acute Care Settings* (2014), https://www.ismp.org/tools/highalertmedications.pdf.  In addition, the drug must be handled and stored with care:  any unused diluted Vasostrict® solution must be discarded after eighteen hours at room temperature or twenty-four hours under refrigeration.  Vials may be held up to twelve months upon removal from refrigeration to room-temperature storage conditions within the labeled shelf life, and after initial entry into the 10 mL multi-dose vial, the remaining contents must be refrigerated and discarded after thirty days.  Intravenous vasopressin products must also be inspected for particulate matter and discoloration prior to administration.  *See* Vasostrict® Label, *supra*.

54.     On April 19, 2017, an outsourcing facility, QuVa Pharma, Inc. ("QuVa"), submitted a one-and-a-half page nomination to FDA's public docket No. FDA-2015-N-3469 nominating vasopressin for inclusion on the Clinical Need List.  This nomination was posted to www.regulations.gov on May 1, 2017.  QuVa was founded in 2015 by former Par executives who are currently the subject of pending trade secret litigation initiated against them by Par and Par Pharmaceutical, Inc.  *See generally Par Pharm., Inc. v. QuVa Pharma, Inc.*, No. 3:17-cv-06115-MAS-DEA (D.N.J. filed Aug. 14, 2017).  In that litigation, QuVa has admitted that it intends to commercialize a compounded version of vasopressin "as soon as possible."  Answer at 63 ¶ 45, *Par Pharm.*, No. 3:17-cv-06115-MAS-DEA (D.N.J. Oct. 13, 2017) ECF No. 48.  QuVa's website shockingly declares that "QuVa looks to fill the gap left by the departure of New England Compounding Center."  Laura Cooper, QUVA PHARMA, *Shop Talk: Bain Capital's Chris Gordon and QuVa Pharma's Stuart Hinchen on Rebuilding the Drug Compounding Market* (Feb. 27, 2017), http://www.quvapharma.com/shop-talk-bain-capitals-chris-gordon-quva-pharmas-stuart-hinchen-rebuilding-drug-compounding-market/.

55.     QuVa's nomination of vasopressin identified *no clinical need* for compounding not served by Vasostrict®.  QuVa instead contended—without any factual support—that by compounding vasopressin products from an outsourcing facility as a pre-diluted mixture that is essentially a copy of the dilution of Vasostrict® used currently by hospitals, QuVa may provide healthcare providers with a vasopressin product that is more convenient to administer and less susceptible to dosing error or sterility issues.  *See* Letter from Travis A. Leeah, Vice President of Pharmacy Servs., QuVa, to Div. of Dockets Mgmt., FDA 2-3 (Apr. 19, 2017), https://www.regulations.gov/document?D=FDA-2015-N-3469-0012.     Moreover,   in   its nomination QuVa failed to even identify Vasostrict® as a drug product approved by FDA to treat

the same medical condition as would be treated by a drug product compounded from bulk vasopressin, but instead identified different compounds desmopressin and norepinephrine. Further, QuVa identified no genuine clinical need for such compounded product that is not served by these other approved medications. Indeed, according to QuVa's nomination, the company's compounded product would simply be vasopressin diluted in a saline or dextrose solution, which is how Vasostrict® is prepared for use under its labeling. In other words, the steps QuVa proposes to take in connection with its "compounding" process mirror the very instructions set forth on the FDA-approved labeling for Vasostrict®, demonstrating that the two drug products would be nearly identical.

56.     FDA could not possibly determine that there is a clinical need for bulk compounded vasopressin. Par's Vasostrict® has been the only approved vasopressin drug on the market for over three years and has been administered to patients millions of times. Par is required to, and does, promptly review all adverse event information it receives, and follows written procedures for the surveillance, receipt, evaluation, and reporting of adverse events involving its products. Yet Par is not aware of any adverse event report attributed to dosing errors or sterility issues such as QuVa contends are associated with the dilution of the product prior to administration. Nor is there any evidence to suggest the existence of a subpopulation of patients for whom vasopressin must be administered at a dosage, formulation, or concentration that is different from that which is already met by Vasostrict®. Indeed, Vasostrict®'s FDA-approved labeling identifies no population for which the product is contraindicated, other than patients who are allergic to vasopressin itself, and patients who are allergic to chlorobutanol— which is found only in the multi-dose, 10 mL version of the product, and thus can be avoided by use of the single-dose, 1 mL version. In short, there are no facts to support the assertion of a

clinical need for compounded vasopressin, and there is thus no basis for FDA to authorize the compounding of a vasopressin product under 503B even if FDA attempted to comply with the statute.

      **E.**    **FDA's Authorization Of Bulk Compounding Using Vasopressin & QuVa's Imminent Product Launch**

57.    FDA never solicited public comment on QuVa's nomination (or indeed, any other nomination).  Nevertheless, on July 11, 2017, Par submitted a letter to docket No. FDA-2015-N-3469 explaining that QuVa's nomination of vasopressin failed to include the information required under the Bulk Compounding Decree to provide "adequate support" for the nomination, including a failure to identify a clinical need not served by FDA-approved drug products but which would be served by a compounded drug product prepared from bulk vasopressin.  Par further alerted FDA that the nomination of vasopressin raised significant public safety concerns, and would, if granted, result in the compounding of "essentially a copy" of an FDA-approved drug in violation of Section 503B.

58.    FDA added vasopressin to Category 1 in its July update to its nominations list, authorizing bulk compounding using vasopressin.  FDA did not respond to Par's letter.

59.    On July 24, 2017, Par couriered a new letter to officials within the Office of Compliance of FDA's Center for Drug Evaluation and Research (CDER), with a copy to other officials within CDER as well as within FDA's Office of the Chief Counsel, urging FDA to reconsider its posting of vasopressin in Category 1 of its nominations list and detailing the reasons to do so.

60.    On September 11, 2017, representatives of Par met in person with officials in FDA's CDER and Office of the Chief Counsel, in another attempt to convince FDA to conform its conduct to the requirements of the FDCA.

61.     On September 15, 2017, Defendant FDA Commissioner Gottlieb admitted in an interview with Reuters that many compounders are operating in a manner inconsistent with the FDCA.  *See* Nate Raymond, *Exclusive: FDA Plans New Compounding Pharmacy Policy, Agency Head Says*, Reuters (Sept. 15, 2017, 5:29 PM), http://www.reuters.com/article/us-usa-fda-pharmacies-exclusive/exclusive-fda-plans-new-compounding-pharmacy-policy-agency-head-says-idUSKCN1BQ2RV.

62.     On October 13, 2017, QuVa represented to a federal district court that it has "plans to launch a vasopressin product as soon as possible" and that it opposes Par's efforts to delay or prevent QuVa's launch of that product.  QuVa also stated, in papers filed in federal court, that it believes it is authorized to launch a compounded vasopressin drug based on FDA's Bulk Compounding Decree and FDA's listing of vasopressin in Category 1.

63.     On October 20, 2017, representatives of Par met telephonically with officials in FDA's CDER and Office of the Chief Counsel, in a final attempt to convince FDA to conform its conduct to the requirements of the FDCA.  During that discussion, FDA refused to provide any information about its plans to revise its Bulk Compounding Decree or its listing of vasopressin in Category 1.

64.     Despite Par's repeated outreach, FDA has not revised its Bulk Compounding Decree or its listing of vasopressin in Category 1.

65.     In the currently pending trade secret litigation, QuVa has filed a declaratory judgment counter-claim for all of Par's patents listed in the Orange Book—an action that would be prohibited if they had properly filed a follow-on drug application under the Hatch-Waxman amendments.  Answer at 57 ¶ 20, *Par Pharm.,* No. 3:17-cv-06115-MAS-DEA, ECF No. 48. QuVa asserted the immediacy of its product launch as the basis for its case or controversy under

the Declaratory Judgment Act. *Id.* at 63 ¶ 45. This demonstrates imminent irreparable harm to Par as well as explicit circumvention of the Hatch-Waxman amendments that the Bulk Compounding Decree facilitates.

66. In addition to the immediate irreparable harm caused by QuVa's illegal entry into the market, QuVa's attempt to end run the otherwise required statutory procedures for follow-on drugs added by the Hatch-Waxman amendments would deprive Par of important statutory rights, including a 30-month stay of approval of a QuVa vasopressin follow-on drug application during the pendency of any suit to permit resolution of potential patent issues. FDA has thus effectively eviscerated Congress' carefully constructed statutory approval process for allowing follow-on drugs.

67. On information and belief, at least one other compounder is also working to prepare a bulk compounded vasopressin drug for launch. Through its counsel, that undisclosed compounder has also recently filed a "nomination" for vasopressin under FDA's Bulk Compounding Decree. *See* Nomination from Baker Hostetler LLP (July 28, 2017), FDA Docket No. FDA-2015-3469-0023, https://www.regulations.gov/document?D=FDA-2015-N-3469-0023.

## CLAIM I: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
## AGENCY ACTION NOT IN ACCORDANCE WITH LAW
### Violation of 5 U.S.C. § 706; 21 U.S.C. §§ 353b, 355

68. The foregoing paragraphs are incorporated by reference as if set forth in full.

69. "FDA has no legal authority to permit the marketing of any unapproved 'new drug.'" H.R. Rep. No. 98-1168, at 21 (1984). And FDA is not free to create its own exceptions to the statutory new-drug approval process. *See, e.g.*, *Cutler*, 475 F. Supp. at 854 ("The Commissioner's . . . regulations formally authorize the continued marketing of . . . drug products in the absence of an administrative determination that those products are, today, generally

recognized by experts as safe and effective.  This flies in the face of the statutory scheme.");

*Hoffmann-LaRoche*, 425 F. Supp. at 894 ("FDA's policy of permitting new drugs to be marketed

without an approved new drug application contravenes the clear statutory requirement[s] . . . .").

70.     In the case of follow-on drug products, the FDCA provides that FDA must

comply with the statute's protections for patent holders.  21 U.S.C. § 355(b)(2)(A), (j)(2)(A)(vii).

71.     FDCA Section 503B provides a narrow statutory exception to the new-drug

approval process for certain compounded drugs manufactured by outsourcing facilities, but it

provides the precise statutory procedures that FDA must follow to exempt those facilities from

the new-drug approval process under Section 505.

72.     FDCA Section 503B(a)(2)(A) provides that bulk drug substances used for

compounding in an outsourcing facility must, among other criteria, appear on either FDA's

Shortage List or FDA's Clinical Need List in order to be made in bulk and exempt from the new-

drug approval process.  *Id.* § 353b(a)(2)(A).

73.     FDCA Section 503B(a)(2)(A)(i) provides that, to add a bulk drug substance to

the Clinical Need List, FDA must make a record-based determination about a clinical need for

bulk compounding of that particular substance, pursuant to specific statutory notice and

comment procedures.  *Id.* § 353b(a)(2)(A)(i).

74.     FDCA Section 503B(a)(5) also prohibits compounded drugs that are "essentially

a copy of one or more approved drugs."  *Id.* § 353b(a)(5).

75.     FDA has never implemented the Clinical Need List.

76.     Moreover, FDA's Bulk Compounding Decree authorizes outsourcing facilities to

engage in compounding using a bulk drug substance without going through the new-drug

approval process when the bulk drug substance appears in Category 1 of a different list not referenced or authorized by statute, known as the nominations list.

77.     FDA's Bulk Compounding Decree permits the addition of a bulk drug substance to Category 1 of the nominations list through a process that does not involve notice and comment, and that does not involve FDA making a record-based determination about the clinical need for compounding such substance.

78.     FDA's Bulk Compounding Decree permits the addition of a bulk drug substance to the nominations list even if the substance will be used to create drugs that are "essentially a copy of one or more approved drugs." *Id.* § 353b(a)(5).

79.     FDA's Bulk Compounding Decree also authorizes the production of follow-on drug products without compliance with the patent protection procedures in 21 U.S.C. § 355(c)(3)(C), (j)(5)(B)(iii).

80.     FDA's promulgation of the Bulk Compounding Decree constitutes final agency action.

81.     The Bulk Compounding Decree is not a lawful exercise of FDA's enforcement discretion.  It issues a broad, forward-looking dispensation to industry as a whole, *Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 171 (D.D.C. 2000), and it directly violates Congress's clear and detailed commands, *see Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013).

82.     The Bulk Compounding Decree is inconsistent with the plain language of the FDCA and is therefore not in accordance with law.

## CLAIM II: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
## AGENCY ACTION NOT IN ACCORDANCE WITH LAW
### Violation of 5 U.S.C. § 706; 21 U.S.C. §§ 353b, 355

83.     The foregoing paragraphs are incorporated by reference as if set forth in full herein.

84.     "FDA has no legal authority to permit the marketing of any unapproved 'new drug.'" H.R. Rep. No. 98-1168, at 21 (1984).  And FDA is not free to create its own exceptions to the statutory new-drug approval process.  *See, e.g.*, *Cutler*, 475 F. Supp. at 854 ("The Commissioner's . . . regulations formally authorize the continued marketing of . . . drug products in the absence of an administrative determination that those products are, today, generally recognized by experts as safe and effective.  This flies in the face of the statutory scheme."); *Hoffmann-LaRoche*, 425 F. Supp. at 894 ("FDA's policy of permitting new drugs to be marketed without an approved new drug application contravenes the clear statutory requirement[s] . . . .").

85.     In the case of follow-on drug products, the FDCA provides that FDA must comply with the statute's protections for patent holders.  21 U.S.C. § 355(b)(2)(A), (j)(2)(A)(vii).

86.     FDCA Section 503B provides a narrow statutory exception to the new-drug approval process for certain compounded drugs manufactured by outsourcing facilities, but it provides the precise statutory procedures that FDA must follow to exempt those facilities from the new-drug approval process under Section 505.

87.     FDCA Section 503B(a)(2)(A) provides that bulk drug substances used for compounding in an outsourcing facility must, among other criteria, appear on either FDA's Shortage List or FDA's Clinical Need List in order to be made in bulk and exempt from the new-drug approval process.  *Id.* § 353(a)(2).

88.     FDCA Section 503B(a)(2)(A)(i) provides that, to add a bulk drug substance to the Clinical Need List, FDA must make a record-based determination about a clinical need for bulk compounding of that particular substance, pursuant to specific statutory notice and comment procedures.  *Id.* § 353b(a)(2)(A)(i).

89.     FDCA Section 503B(a)(5) also prohibits compounded drugs that are "essentially a copy of one or more approved drugs."  *Id.* § 353b(a)(5).

90.     QuVa's vasopressin nomination contains no supporting evidence—and FDA has made no finding—that there is a clinical need for drug compounding with the bulk drug substance vasopressin.

91.     Nonetheless, FDA's listing of vasopressin within Category 1 of its nominations list authorizes bulk compounding of vasopressin through a general, prospective promise of non-enforcement.

92.     Because QuVa has provided no basis for FDA to conclude that compounded drugs using vasopressin will "produce[] for an individual patient a clinical difference" as compared to an approved drug, *id.* § 353b(d)(2), FDA's placement of vasopressin in Category 1 of its nominations list also facilitates production of "essentially a copy of an approved drug." *Id.* § 353b(a)(5).

93.     Vasostrict® is protected by five unexpired patents listed in the Orange Book, yet FDA has authorized compounded drugs using vasopressin without observing the patent-protection procedures in 21 U.S.C. §§ 355(c)(3)(C), (j)(5)(B)(iii).

94.     FDA's listing of vasopressin in Category 1 of its nominations list and its authorization to bulk compound vasopressin were a final agency action.

95.     FDA's listing of vasopressin contravenes the express terms of FDCA Section 503B and the FDCA's new-drug approval requirements, *id.* § 355, and is therefore not in accordance with law.

## CLAIM III: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
## ARBITRARY AND CAPRICIOUS AGENCY ACTION
### Violation of 5 U.S.C. § 706(2)(A)

96.     The foregoing paragraphs are incorporated by reference as if set forth in full herein.

97.     FDA's Bulk Compounding Decree announces that outsourcing facilities may begin compounding drugs using bulk drug substances that "may be eligible for inclusion on the [Clinical Need] list" and which "were nominated with sufficient supporting information for FDA to evaluate them."  Bulk Compounding Decree at 5.

98.     In order for FDA to evaluate nominated bulk drug substances, the nomination must, *inter alia*, (1) describe the medical condition the drug product to be compounded with the nominated bulk drug substance is intended to treat; (2) provide a list of FDA-approved products that treat the same condition; (3) address why, if an FDA-approved product is available, a compounded drug product is necessary and why the compounded drug product must be compounded from a bulk drug substance, rather than from the FDA-approved product itself; and (4) estimate the number of persons who would need the compounded drug product.  *See* Request for Nominations, 79 Fed. Reg. at 37,751.

99.     QuVa's vasopressin nomination acknowledged that there are other drug products approved by FDA to treat the same medical conditions as a drug product compounded from bulk vasopressin, but the nomination failed to list Vasostrict[®] and did not address why there is a clinical need for a compounded drug product that addresses the same medical conditions.

100.     QuVa's vasopressin nomination did not identify any patients with unserved medical needs.   Instead, it noted that "[v]asopressin is [currently] supplied in a concentrated solution which must be further diluted prior to intravenous administration," and sought to justify its nomination on the basis that providing the product in its final concentration would decrease "dosage errors and sterility issues."

101.     In effect, QuVa's nomination only suggests (incorrectly) a way to improve upon administration of commercially available vasopressin drug products.

102.     For the foregoing reasons, FDA's inclusion of vasopressin in Category 1 of the nominations list under the Bulk Compounding Decree is arbitrary, capricious, and/or an abuse of discretion.

**REQUEST FOR RELIEF**

Par respectfully requests that the Court enter judgment in its favor and grant the following relief:

1.     A declaration as follows:

    a.     The Bulk Compounding Decree is contrary to law, including 21 U.S.C. § 353b and 21 U.S.C. § 355(a), because it is inconsistent with the statutory regime established by Congress and authorizes bulk compounding of "new drugs" where the applicable statutory requirements are not satisfied;

    b.     FDA's authorization allowing bulk compounding of vasopressin is contrary to law, including 21 U.S.C. § 353b and 21 U.S.C. § 355(a), because it is inconsistent with the statutory regime established by

Congress and authorizes bulk compounding of vasopressin where the applicable statutory requirements are not satisfied; and

c.     Even if the Bulk Compounding Decree were lawful, the inclusion of vasopressin in Category 1 of the nominations list violates the Administrative Procedure Act because that designation was arbitrary, capricious, and an abuse of discretion.

2.     Orders preliminarily enjoining and vacating the Bulk Compounding Decree and the listing of vasopressin in Category 1 of the nominations list.

3.     Orders preliminarily and permanently enjoining FDA from authorizing bulk drug compounding using vasopressin without compliance with the new-drug approval process, 21 U.S.C. § 355, or the statutory exemption therefrom at 21 U.S.C. § 353b.

4.     An order awarding Par its costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

5.     Such other and further relief as the Court deems just and proper.

Dated:  October 26, 2017

Respectfully submitted,

_____/s/  Philip J. Perry_____

Philip J. Perry (DC Bar No. 434278)
John R. Manthei (DC Bar No. 447123)
J. Ben Haas (DC Bar No. 479834)
Andrew D. Prins (DC Bar No. 998490)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: philip.perry@lw.com

*Attorneys for Plaintiffs*